# Exhibit A

Electronically Filed by Superior Court of California, County of Orange, 07/21/2026 09:27:48 AM.
30-2026-01587094-CU-BC-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By M. Diaz, Deputy Clerk.

LOEB & LOEB LLP
DAVID GROSSMAN (SBN 211326)
dgrossman@loeb.com
TYLER D. DOWNING (SBN 339537)
tdowning@loeb.com
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067-4120
Telephone: 310-282-2000
Facsimile: 310-282-2200

Attorneys for Plaintiff
STEVE LICHTMAN

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

| | |
|---|---|
| STEVE LICHTMAN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>COLLECTORS UNIVERSE, INC., d/b/a PROFESSIONAL SPORTS AUTHENTICATOR, a Delaware corporation; COLLECTORS HOLDINGS, INC., a Delaware corporation; and Does 1 through 50,<br><br>Defendants. | Case No. 30-2026-01587094-CU-BC-CJC<br><br>**COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**DEMAND FOR A JURY TRIAL**<br><br>Assigned for all purposes:<br>Judge Lindsey E. Martinez |

Plaintiff Steve Lichtman ("Lichtman"), for his Complaint against defendant Collectors Universe, Inc., doing business as Professional Sports Authenticator or PSA ("PSA"), Collectors Holdings, Inc. ("Collectors Holdings"), and Does 1 through 50 (collectively, "Defendants"), hereby alleges as follows:

**INTRODUCTION**

1. The trading card market revolves around grades. Trading cards are "graded" so that lay people can more easily determine their quality in comparison with other cards of the same type. A trading card's price varies widely based on its grade, with a 10 (a "gem mint") going for a significantly higher price than an 8 (a "near mint") or lower, for example. When grading, experts look to, among other things, whether the card is centered, its corners remain sharp, and it is free from scratches and creases to determine where it falls on the numerical scale. Graders also look to whether the card is authentic or has been tampered with in some way when rendering their grades.

2. These measurements are intended to offer a reliable and objective point of comparison between two cards. Traders rely on them. In a market where differing grades can lead to hundreds of thousands if not millions of dollars in price differences, graders play a pivotal role in securing, or tanking, a collector's investment. Previous market competition and independence kept grading companies honest and in check as it pertains to prices for services and giving consumers an alternative. Unfortunately, the market has become a monopoly with a single company, Collectors Holdings, controlling over 80% of the total market volume through the largest grading company, PSA, and Collectors Holdings' other acquisitions. As it relates to this suit, Collectors Holdings has weaponized its control over the grading system to drive collectors to a single grading company and inflate and deflate the prices of trading cards in ways that benefit itself, and a select group of others, at the expense of collectors.

***

3. Plaintiff Steve Lichtman is a prominent collector of valuable sports memorabilia, including high-quality sports cards. His well-known collection includes, among other cards, a highly-graded T206 Honus Wagner card (which has been described by experts as the Holy Grail

of baseball cards),[1] an impeccable Mickey Mantle rookie card, and one of the most immaculate Wilt Chamberlain rookie cards in existence. Numerous experts have assigned very high grades to Mr. Lichtman's very significant baseball and basketball card collection and have examined them versus similarly graded PSA cards.

4. PSA is the dominant firm in the market for grading and authenticating collectible sports memorabilia cards.[2] As a result of a spate of acquisitions of PSA's main rivals in recent years, Collectors Holdings has all but eliminated competition in the grading and authentication market in which it operates, particularly in the sports card category. PSA has not only become the industry leader, but it also has reached a level of such supremacy and market dominance that it now serves in effect as the unelected arbiter of the quality, condition and economic worth of high-end sports cards. In recent years, Collectors Holdings has acquired two of its direct competitors, both of which were prominent sports grading companies with strong industry reputations. However, PSA has refused to honor the grades previously assigned by those companies in order to shape the market to its whims.

5. There now exists a disconnect between cards that *should* be given high grades and cards that PSA previously assigned improperly-high scores. For example, below are four of the

---

[1] *See also* B. Burrows, L. Holder, C. Trent Rosecrans, L. Weaver, C. Mezzy, M. Salfino, C. Custance & B. Peck, *The 10 most important baseball cards of all time: Mantle and Wagner battle for top spot*, THE ATHLETIC (Mar. 25, 2026; updated Mar. 26, 2026), https://www.nytimes.com/athletic/7145353/2026/03/25/baseball-cards-most-important-mickey-mantle-honus-wagner/.

[2] *See, e.g.*, D. Knox, *How PSA Built An Industry Leader Around Grading And Authentication*, FORBES (Dec. 12, 2023), https://www.forbes.com/sites/daveknox/2023/12/12/how-psa-built-an-industry-leader-around-grading-and-authentication/.

six 1952 Topps Mickey Mantle rookie cards that PSA has graded with a "9" rating. Mr. Lichtman owns a 1952 Topps Mickey Mantle rookie card that also has a 9 grade from one of the companies that Collectors Holdings acquired. Experts have assessed that Lichtman's card appears to be superior to the four specimens pictured here, yet PSA has failed and refused to assign Lichtman's card its proper grade.




6. PSA's business practices have restrained the market for collectible sports memorabilia cards by artificially reducing the value of superior cards that PSA has graded recently in contrast to rival inferior cards that were graded many years ago. In other words, PSA has created a situation where cards graded many years ago, and that received improperly-high grades, are worth substantially more than recently-graded superior cards.

7. By way of one example, rather than apply the reliable grading metrics promised, PSA has exacerbated its market interference by "reholdering"[3] cards that were graded many years ago without correcting obvious grading errors, as PSA claims to do. PSA is required to correct improperly-high grades that were previously assigned to cards it graded. When it corrects those inflated grades, it is required to compensate the collector for the monetary difference between the erroneously-graded card and the lower, corrected grade assigned to that same card. However, PSA profits from its unfair practice of reholdering cards without correcting the inflated grades because it collects "reholdering fees" without honoring the substantial financial guarantees that it provides to card owners to compensate them for the reduced value of previously overgraded cards. PSA will claim that it spends substantial amounts of money buying back cards that are not worthy of today's standards, but in reality, the amount it is spending is a fraction of what it should be paying in order to correct the mis-graded cards in the marketplace. As a result, PSA has now created a preposterous situation where an inferior card graded with an improperly-high "9" rating many years ago is currently valued higher than a superior version of the same card that has only received an "8" grade based on PSA's current grading standards.

8. Because of its market dominance, in order to preserve and maximize the value of their investments, collectors such as Lichtman have little choice but to try to do business with PSA and to yield to PSA's demands for payment of exorbitant fees in the hopes that PSA will deal impartially with them and assign honest and fair PSA grades to their cards. But whereas collectors such as Lichtman need PSA to perform grading services fairly, without bias, and in accordance with its own published grading standards, business terms, and public commitments, the reality of PSA's business – as Lichtman's experiences demonstrate – is shockingly at odds with these standards and commitments.

9. Indeed, far from honoring its duties and commitments to its customers, Collectors Holdings and PSA have abused their market dominance in multiple ways, and have caused enormous damage to consumers in the process, as PSA's arbitrary and unfair treatment of

---

[3] Reholdering is a process by which a card is removed from its current protective casing and placed in the latest holder and label for a fee.

Lichtman illustrates. This lawsuit arises from the bad faith, unfair treatment, and fraudulent business practices that have specifically infected PSA's dealings with Lichtman, and have harmed Lichtman and countless others in the process.

10. As detailed below, PSA has betrayed its duties to Lichtman (and other customers with valuable sports card collections) in numerous ways. On multiple dates during the period from 2022 to 2024, Lichtman submitted extremely valuable cards that he owned to PSA for grading. Lichtman fulfilled all of his obligations to PSA, including paying all of the fees that PSA demanded, no matter how exorbitant. In exchange, Lichtman expected, and had the right to expect, that PSA would perform its side of the transactions. PSA was obligated to deal with Lichtman in good faith; and to evaluate and grade the cards that Lichtman had submitted objectively, based solely on their merits, and in accordance with the business terms and grading standards that PSA had adopted, published, and committed itself to follow. But PSA fell far short of its commitments.

11. Among other things, PSA acted in bad faith in its dealings with Lichtman; failed to honor its contractual duties to Lichtman; and engaged in unfair and fraudulent behavior and business practices that damaged Lichtman. To cite one of many examples of this wrongful behavior, PSA caused considerable harm to Lichtman by assigning lower grades than were objectively warranted to a number of Lichtman's most valuable cards – and did so, at least in part, to protect the personal investments of senior executives, investors or shareholders of Collectors Holdings (the holding company that owns PSA) who owned rival cards and stood to benefit personally from depressing the resale value of Lichtman's cards.

12. In so doing, PSA attempted to justify the artificially depressed grades that it had assigned to Lichtman's cards by asserting that its graders had simply been rendering "opinions," but such claims were disingenuous and untrue. In actuality, PSA's grading decisions had been driven by its goal of "population control," a practice by which PSA attempts to depress the number of highly graded, high profile cards in order to prop up the value of existing inventory.

13. At the same time, and while deflating the value of cards owned by other collectors, PSA engages in the dishonest practice of *grading cards owned by Collectors Holdings executives,*

*shareholders, investors, and other insiders* – and, in so doing, applies more lenient grading standards to inflate those cards' value. Rather than hide their scheme, Collectors Holdings executives are brazen enough to brag on social media about the high PSA grades that their cards received through this self-dealing.

14. Beyond the fact that PSA's grading decisions regarding multiple cards that Lichtman submitted to PSA were artificially low and clearly appeared to be tainted by the financial interests of certain Collectors Holdings insiders, Lichtman is informed and believes, and based thereon alleges, that Collectors Holdings and PSA deliberately targeted Lichtman for particularly unfair treatment as a result of prior interactions that Lichtman had with Nat Turner ("Turner"), Collectors Holdings' CEO.[4]

15. Further, Collectors Holdings and PSA have engaged in false and misleading advertising and have materially misled consumers. Collectors Holdings and PSA have falsely portrayed PSA as an honest and objective grading service that fairly grades sports cards based solely on their merits, when, in fact, its operations were rife with unfairness and subjectivity. Collectors Holdings and PSA falsely depicted PSA as being operated independently from Collectors Holdings, when, in fact, it is effectively PSA that is driving Collectors Holdings' decisions and the other companies that Collectors Holdings has acquired. Additionally, when Collectors Holdings acquired SGC, which had been PSA's most significant competitor, in February 2024, Collectors Holdings falsely promised to preserve the integrity of SGC's business operations following that acquisition and to allow it to operate independently of PSA and without interference by Collectors Holdings' management. These assurances and commitments were

---

[4] In one prior incident, PSA had unfairly refused to cross a 1952 Bowman Mickey Mantle card that Lichtman owned from SGC, LLC ("SGC") to PSA, despite the fact that multiple experts who had viewed Lichtman's card had expressed the informed and experienced opinion that Lichtman's card was superior to all of the other 1952 Bowman Mantle cards they had seen. In the wake of that puzzling decision, Lichtman learned that Turner owned one of the two 1952 Bowman Mantle cards that PSA had graded at that level. Lichtman then asked Turner if Turner's personal interest in that grading decision was the reason for PSA's otherwise inexplicable refusal to cross Lichtman's card from SGC to PSA. Turner reacted in a hostile and antagonistic manner to Lichtman's inquiry, and Lichtman understands that Turner formed a lasting grudge toward Lichtman as a result of that interaction.

false, and SGC was rendered ineffectual as a stand-alone entity following that acquisition. Lichtman is informed and believes, and based thereon alleges, that Collectors Holdings and PSA effectively controlled SGC's operations after its acquisition by, among other things, controlling the prices that SGC was permitted to charge (so that SGC would not take business away from PSA).

16. Additionally, following the SGC acquisition, Collectors Holdings drastically curtailed SGC's operations under the guise of turning it into a "boutique" trading company; this caused submissions to SGC to plummet[5] and the market values of many SGC-graded cards – including high-end cards such as those owned by Lichtman – to decline. Contrary to the commitments that Collectors Holdings had made at the time of the SGC acquisition, SGC's leadership – seeing that Collectors Holdings had relegated SGC's once thriving business to second-class status so as not to compete with PSA – departed just 18 months after the transaction closed rather than stay involved in running SGC.

17. Moreover, Collectors Holdings and PSA have engaged in a host of actions and business practices that fly in the face of their public commitments, violate consumer protection laws, and breach the promises that they have made to their customers – Lichtman included. As Collectors Holdings has swallowed up PSA, SGC, Beckett Grading Services ("Beckett"), and other companies, and has gained overwhelming dominance of the sports card grading and authentication market, Collectors Holdings and PSA have increasingly engaged in unfair business practices, including in dealings with Lichtman.

18. The misconduct of Collectors Holdings and PSA, as detailed in this Complaint, has caused Lichtman to suffer serious harm. Indeed, by virtue of Collectors Holdings' and PSA's dominant position as the behemoth of the market for grading and authenticating sports memorabilia cards, their unfair and fraudulent business practices threaten the very integrity of that

---

[5] *See* https://patryan.house.gov/congressman-ryans-letter-ftc-chair-collecters-consolidation ("Despite initial assurances of independence, SGC's leadership departed shortly after the merger, resources were diverted to PSA, and SGC's grading volume plummeted by 61% in just two months.").

market and, by extension, threaten the investments and economic value that Lichtman and many other collectors have sought to build in reliance on PSA's commitments. By this lawsuit, Lichtman seeks monetary damages and other relief necessary to compensate him for the injuries he has suffered, to punish Collectors Holdings and PSA for their wrongful and outrageous conduct, and to deter and prevent Collectors Holdings and PSA from engaging in similar conduct in the future.

## THE PARTIES

19. Lichtman is an individual who resides in Miami, Florida. Lichtman is a respected collector who owns a valuable and well-known portfolio of high-quality sports cards.

20. Lichtman is informed and believes, and based thereon alleges, that PSA is a Delaware corporation whose headquarters and principal place of business are located in Santa Ana, California. As noted, it conducts business and operates trading card grading services under the brand name PSA. Based in part on public statements and disclosures by Collectors Holdings or PSA, Lichtman is informed and believes, and based thereon alleges, that PSA is a division or subsidiary of Collectors Holdings.

21. Lichtman is further informed and believes, and based thereon alleges, that Collectors Holdings is a Delaware corporation whose headquarters and principal place of business are located in Santa Ana, California, with a physical address at 1610 E. Saint Andrew Place, Santa Ana, CA 92705. Lichtman is further informed and believes, and based thereon alleges, that Collectors Holdings is the parent company of, and the holding company that owns and controls, PSA.[6]

22. Lichtman does not know the true names and capacities of the defendants named herein as Does 1 through 50, and therefore sues these defendants under such fictitious names. Lichtman is informed and believes, and based thereon alleges, that Does 1-50 include individuals and business entities tied to Collectors Holdings and/or PSA who advanced and assisted in the unlawful acts described herein; and that the Doe defendants, and each of them, are, and at all

---

[6] *See, e.g.,* https://www.collectors.com. Collectors Holdings is a holding company focused on the collectibles industry. *See* https://www.operatorpartners.com/team-nat-turner.

material times have been, the agents, alter egos and servants of, and have acted in concert with, Collectors Holdings, PSA, and one another with respect to the acts and conduct herein alleged, and are responsible for and liable to Lichtman for the damages and losses arising out of such acts and conduct and have benefited and profited financially therefrom. Lichtman will amend this complaint to allege the true names, capacities and conduct of Does 1 through 50 when and as Lichtman ascertains them.

## JURISDICTION AND VENUE

23. Jurisdiction in this Court is proper because the headquarters and principal places of business of PSA and Collectors Holdings are located in Santa Ana, California; PSA and Collectors Holdings conduct business in the State of California; PSA and Collectors Holdings have derived substantial benefits and revenues from their business activities in California; and the claims that form the basis of this Complaint are believed to arise out of PSA's and Collectors Holdings' activities in California. Accordingly, this Court has jurisdiction in this matter pursuant to, *inter alia*, California Code of Civil Procedure § 410.10 and the California Constitution, Article VI, § 10.

24. Venue is proper under Section 395.5 of the California Code of Civil Procedure because, *inter alia*, the headquarters and principal place of business of PSA and Collectors Holdings are located in Orange County, California.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. Overview of the Collectible Sports Card Trading and Grading Industries

25. Collectible sports cards have grown from a nostalgic hobby into a multibillion-dollar industry with a lucrative secondary market. Grading and authentication firms such as PSA function, in effect, as the gatekeepers and referees of that secondary market. Indeed, since the acquisition of SGC, PSA has also become one of the largest sellers of sports cards on eBay.

26. High-quality, authentic, iconic sports cards like several of those in Lichtman's collection are of considerable value to collectors. A critical factor in the valuation of each trading card is its physical condition. Pristine cards are worth far more than those that are faded or stained, have bent or frayed edges, or are otherwise damaged, physically altered, or even

counterfeit. However, many purchasers and collectors lack the experience and knowledge necessary to determine the authenticity, quality and rarity (and hence the value) of high-priced collectibles with confidence, even when they have the opportunity to examine them physically before consummating a transaction.[7] Prospective buyers sometimes have no reliable sources of information about the conditions of the cards being offered for sale other than the sellers' representations regarding the authenticity, quality, and rarity of those cards, but the usefulness of such representations may be diminished by the sellers' financial interests in obtaining the highest possible prices for their cards.

27. These and other market conditions[8] have fostered a need and demand for independent third-party authentication and grading services by firms like PSA. In theory, such services – if performed with integrity, honesty, and skill – would add value and enhance information transparency between buyers and sellers by enabling market participants to obtain impartial and informed determinations of the authenticity and quality of high-value collectibles (even those purchased over the Internet) using transparent standards applied by unbiased experts. Such services, if performed competently and with integrity, also would be useful to buyers and collectors in helping them to understand the factors that can affect an item's value and price. If the card-grading process is flawed, unreliable, or abused by the grading firms, however, collectors such as Lichtman and the market as a whole suffer the consequences.

28. Indeed, Congressman Pat Ryan recently recognized the critical issues facing consumers by virtue of PSA's misconduct and business practices, and sent a letter to the Chairman of the Federal Trade Commission ("FTC") demanding that Collectors Holdings be investigated:

> The collectibles industry has evolved from a niche hobby into a sophisticated asset class, where the financial value of an item is inextricably tied to its "grade" or

[7] The principal risk to a buyer in the secondary sports card market is paying top-grade prices for counterfeit or materially altered cards – in other words, cards that have been trimmed, recolored, pressed, or otherwise doctored, yet masquerade as unaltered cards.

[8] Another issue is that the advent of the Internet, particularly eBay's development of an Internet or "virtual" marketplace, has heightened concerns about the authenticity and quality of collectibles that are listed for sale. Many buyers lack the ability to physically examine collectibles, and they often must depend on the identity or credibility of sellers whom the buyers do not know and never meet in person.

certified condition. Third-party grading serves as the essential market infrastructure for this industry, providing the objective authentication and preservation that enables liquidity and price discovery. Because a single grade point can represent a difference of tens of thousands of dollars in value, the integrity and independence of the grading process are paramount. Collectors' strategy of consolidation and integration has given it the power to manipulate the value of the underlying assets, dictate terms to thousands of small businesses, and control the standards of an entire financial ecosystem.[9]

29. Collectors Holdings – and its PSA unit in particular – is the dominant firm in the market for grading and authenticating collectible sports memorabilia cards as a result of Collectors Holdings' recent acquisitions of nearly all of PSA's main competitors[10] and its other anticompetitive behavior, including, but not limited to, its post-acquisition downgrading and downsizing of SGC. Collectors Holdings is estimated to control more than eighty percent (80%) of the market for grading collectible cards and well over ninety percent (90%) of the market for grading sports cards in the United States, according to GemRate's *2025 Grading Year in Review*. As a result of this staggering market power, Collectors Holdings is not only a monopolist, but it is now the *only* significant and relevant firm in the market for grading and authenticating collectible

---

[9] *See* https://patryan.house.gov/congressman-ryans-letter-ftc-chair-collecters-consolidation

[10] Collectors consolidated its market dominance after February 2021, when a private equity group purchased Collectors, including its PSA division, for approximately $853 million, in a take-private transaction that resulted in Collectors being delisted from any publicly traded securities index. Since then, Collectors Holdings has engaged in a spate of acquisitions of rival grading firms. Perhaps most prominently, Collectors Holdings acquired SGC, which had been PSA's main rival, in early 2024. More recently, Collectors Holdings announced in December 2025 that it was acquiring Beckett, which, until this acquisition, had been one of PSA's longtime rivals in the card grading and authentication industry. *See* D. Hajducky, *PSA's parent company buys card grading rival Beckett*, ESPN.COM (Dec. 15, 2025), https://www.espn.com/espn/story/_/id/47319181/psa-parent-company-buys-card-grading-rival-beckett; B. Burrows, *Led by PSA, Collectors corners even more of grading market by acquiring Beckett*, CLLCT (Dec. 16, 2025), https://www.cllct.com/sports-collectibles/memorabilia/led-by-psa-collectors-corners-even-more-of-grading-market-by-acquiring-beckett ("For the second time in the last two years, trading card giant Collectors has consolidated the grading and authentication industry by acquiring a competitor to the company's premier brand, PSA…."); *see also id.* ("Since GemRate began tracking grading data in January 2022, PSA has never graded fewer than 70% of cards featured on the Iconic 100 in a single year. [¶] In total, there are more than 1.5 million graded examples in existence of cards listed on the Iconic 100, including more than 1 million graded by PSA. Combined with cards graded all-time by Beckett and SGC, Collectors brands now account for 98.9% of graded examples on the list.")

sports memorabilia cards.[11]

30. PSA itself has admitted that it is the world's largest sports trading card authentication and grading company, and it has claimed to have certified over 40 million cards and collectibles with a cumulative declared value of over one billion dollars ($1,000,000,000.00). Not surprisingly, Collectors Holdings' conduct has led to calls for federal antitrust scrutiny of the company as well as a recently filed class action lawsuit charging Collectors Holdings, PSA, and certain of their affiliates with violations of the federal Sherman Act and Clayton Act.[12]

31. The grades that PSA assigns to sports trading cards have a direct and substantial impact on their resale values. Even seemingly small errors by PSA graders can have dramatic effects on the cards' market valuations and the prices that the cards in question can fetch when offered for sale. Depending on the card, a step-up of only one or two grades – or even half a grade – can increase a card's value by a factor of ten or more. For example, a 1952 Topps Mickey

---

[11] As Congressman Pat Ryan stated in his letter to the FTC:

> In less than five years, Collectors has systematically eliminated its competitors through serial acquisitions. Following the 2021 acquisition of PSA, the company acquired SGC in February 2024 and has now announced the acquisition of Beckett in December 2025. This pattern has resulted in a staggering concentration of power: current data indicates PSA holds a 72% market share (8.89 million cards), SGC holds 8% (962,000 cards), and Beckett holds 3 percent (366,000 cards). Collectively, these brands represent approximately 83% of the total market volume. If the Beckett deal is allowed to close, CGC Cards will remain the only independent competitor of scale with roughly 17% of the market.
>
> Collectors' dominance is compounded by vertical integration; it controls grading capacity, pricing analytics through CardLadder, and participates in buying and selling graded cards—creating severe conflicts of interest. These risks were highlighted in December 2025, when industry reporting described allegations that PSA purchased PSA 9-graded cards and re-graded them as PSA 10s for resale at a significant financial gain.
>
> Even my four and six year old boys, who just started their collections, know this behavior is wrong….

*See* https://patryan.house.gov/congressman-ryans-letter-ftc-chair-collecters-consolidation.

[12] On April 14, 2026, a private civil antitrust class action was commenced against Collectors Holdings, PSA, and certain of their affiliates in the United States District Court for the Southern District of California. *See Michael Rasmussen v. Collectors Holdings, Inc., et al.*, Case No. 8:2026cv00897 (U.S.D.C. Cent. Dist. Cal.).

Mantle card carrying a PSA grade of 10 (of which there are only three in existence) **is worth over $30 million in the private resale market**; but that same card with a PSA-9 grade (only six are believed to exist) **has a market value of approximately $13 million**. If that same card were to receive a PSA-grade of 8.5 – only half a grade less than a PSA-9 – its market value would drop to **roughly $3.5 million**; and a 1952 Topps Mantle card with a PSA-8 grade would be worth about **$1.5 million**.[13] Notably, Collectors Holdings itself has admitted in a public filing: "The primary determinants of the prices of, and the willingness of sellers, buyers and collectors to purchase high-value or high-priced collectibles, are their authenticity, quality and rarity…. Even a relatively modest difference in quality can translate into a significant difference in perceived value and, therefore, in price."[14]

32. This market dynamic gives PSA and its graders unusual power and leverage over the prices that high-end cards can attract in the resale market. It also underscores the importance to consumers and the industry of ensuring that PSA is grading cards authentically and in good faith – and that its grading decisions are not driven in any way by an agenda of keeping the supply of cards carrying the highest PSA grades artificially low or maximizing the values of cards owned by Collectors Holdings insiders. Unfortunately, the empirical evidence – and Lichtman's own experiences – indicate that, in recent years, PSA has engaged in such unfair business practices, including grading – and assigning inflated grades – to high-end cards owned by Collectors Holdings executives, shareholders, and investors. Moreover, the self-interests of Collectors Holdings' insiders have tainted certain grading decisions by PSA's graders, thereby enhancing the values of cards owned by Turner (the CEO of Collectors Holdings) and other Collectors Holdings

---

[13] Even PSA's own pricing guide confirms the enormous pricing disparities that a grading error can cause. According to the PSA Price Guide, the "PSA price" of a 1952 Topps Mickey Mantle card that received a PSA grade of PSA-9 is seven million dollars ($7,000,000.00); the PSA price of that same card if it received a PSA grade of PSA-8 – only one grade lower than a PSA-9 – is one million eight hundred thousand dollars ($1,800,000.00); and the PSA price of the same card with a PSA grade of PSA-7 is only two hundred fifty thousand dollars ($250,000.00). *See* https://www.psacard.com/cardfacts/baseball-cards/1952-topps/mickey-mantle-311/23330.

[14] *See* Form 10-K for Collectors Universe, Inc., for the fiscal year ended June 30, 2020, p. 2, available at https://www.sec.gov/Archives/edgar/data/1089143/000149315220016754/form10-k.htm.

insiders, and artificially restricting the supply of cards carrying the highest PSA grades. This behavior has created major distortions in the marketplace, including, but not limited to, grading errors that have cost Lichtman substantial amounts of money, as well as a skewed market in which valuable cards that received relatively high PSA grades years ago sell for substantially more money in the resale market than do rival cards that are objectively far superior in quality to those earlier graded cards, but received lower grades merely because PSA graded them more recently.

**B. PSA's Grading Process and Its Commitments to Customers Like Lichtman**

33. Once cards are submitted to PSA for grading, a PSA grader is supposed to inspect and assign grades to the cards, then place them into tamper-proof plastic cases (known as slabs) for preservation and identification purposes. Although numerous factors go into the final grades, cards submitted to PSA are supposed to be evaluated based on four basic (and allegedly objective) characteristics: centering, corners, surfaces, and edges. Based on these traits, as well as such other factors as historical and recent selling prices, PSA – when it grades cards – assigns grades using both a numeric system ranging from 1 to 10 *and* an adjectival system that uses words to describe the cards' condition, such as "Poor," "Fair," "Good," "Very Good," "Excellent," "Near Mint," "Mint," and "Gem Mint" (with "half steps" in between). By way of illustration, "Gem Mint 10" is the terminology used to describe a perfect or virtually perfect card.

34. PSA's grading standards, its business terms, and the commitments that it makes to its customers have obligated PSA to grade cards fairly and in good faith, and to apply a *basic, objective standard* when assigning grades. PSA expressly assures its consumers that all of the sports trading cards that customers submit to PSA are graded "in accordance with PSA grading standards and under the procedures of PSA."[15] As part of those grading standards, PSA assures consumers that "the vast majority of [PSA] grading is applied with a basic, objective standard…."[16] To the extent that a "somewhat subjective" element occasionally comes into play in grading decisions, PSA has stated that this "somewhat subjective" element is employed only

---

[15] *See* https://www.psacard.com/support/faq.

[16] *See* https://www.psacard.com/gradingstandards.

rarely and "does not apply to the vast majority of cards that filter through the PSA grading process each day…." Further, PSA assures consumers that the "somewhat subjective" element is utilized, if at all, only for the very limited purpose of allowing its graders some leeway "based on the strength or weakness of the eye appeal, to make a judgment call on the grade of a particular card" "that falls on the line between two grades."[17]

35. PSA also provides its customers with multiple "guarantees" with respect to its card grading services. For example, "PSA guarantees that all cards submitted shall be graded in accordance with PSA's authentication and grading standards."[18] PSA also guarantees the accuracy of every grade that it assigns to cards; and that, "in the event that PSA assigns an authentic Card a lower grade or deems it ineligible for a grade, [PSA will] refund the difference between its value at the erroneous PSA grade and its value at the revised PSA grade. In such case, the Card will also be returned to the customer along with the refund for the difference in value."[19]

36. Furthermore, Collectors Holdings and PSA assured consumers for many years that PSA's grading standards had not changed and would not change over time – even when those representations were false. In other words, Collectors Holdings and PSA represented that PSA's graders had applied and always would apply the same consistent, objective, unchanging set of

---

[17] *See id.* ("On the other hand, there are cards that technically fall within the printed PSA Grading Standards that may be prevented from reaching a particular unqualified grade because the eye appeal becomes an issue…. [T]his is a **rare occurrence** but it does happen from time to time when a judgment call has to be made on a card that pushes the limits for centering. [¶] … [T]he issues discussed **do not apply to the vast majority of cards** that filter through the PSA grading process each day…. [But] there are times when a PSA grader must make a call on a card that falls on the line between two grades and that final determination is made based on experience, eye appeal and market acceptability.") (emphasis added).

[18] *See* Terms and Conditions of PSA Authenticity and Grade Guarantee. The current version of this document is available at https://www.psacard.com/financialguarantee.

[19] *See id.* Additionally, PSA separately guarantees consumers that, if PSA decides that a card that it graded "no longer merits the PSA grade assigned or fails PSA's authenticity standards, PSA will either: 1) Buy the card from the submitter at the current market value if the card can no longer receive a numerical grade under PSA's standards, or 2) Refund the difference in value between the original PSA grade and the current PSA grade if the grade is lowered. In this case, the card will also be returned to the customer along with the refund for the difference in value." *See* https://www.psacard.com/support/faq.

standards – and they held out PSA's purportedly consistent and unchanging grading standards as one of the bedrocks of PSA's grading system. Indeed, prior to 2025, Turner himself repeatedly – and falsely – represented to the public on podcasts, in interviews, and in other communications that PSA's grading standards had not changed. Moreover, PSA has charged and continues to charge its customers a premium for its grading services based on these and other assurances and guarantees that PSA has provided and continues to provide – and PSA explicitly and prominently advertises itself as the only third-party grading business that provides the assurances and guarantees that PSA provides.

37. In truth, however, PSA's grading standards *have* changed in material ways and have become much stricter than they were in the past – as numerous collectors and industry experts have noted,[20] and as PSA itself well knows. PSA has even revised some of the grading standards posted on its website. Specifically, in early 2025, PSA officially altered its grading criteria in important and material ways that have substantially affected the grades that some high-end cards can receive as well as the resale values of those cards.[21] Moreover, when PSA adopted those changes to its grading standards in early 2025, Turner, on behalf of Collectors Holdings and PSA, stated that the changes that PSA had made to its grading criteria actually represented "[n]o change in day-to-day" at all because "that's how we've been operating for a very long time."[22] Turner further confessed that PSA had: "[j]ust updated the language on the website" because "[t]hat is how we have been operating for a very long time, so it needed updating." Thus, Turner, on behalf of Collectors Holdings and PSA, effectively admitted that PSA's grading standards had

---

[20] *See, e.g.*, M. Felumlee, *PSA Changes Grading Standards*, CARDHOUND VINTAGE (Mar. 3, 2025), https://cardhoundvintage.com/psa-changes-grading-standards/#:~:text=by%20Matt%20Felumlee%20%7C%20Mar%203,year%2C%20as%20we%20documented%20here ("… PSA made some under-the-radar changes to its grading standards recently."); S. Ben-Ephraim, *Why Are PSA Grades Getting Lower?,* CARDLINES (Sept. 19, 2025), https://cardlines.com/why-are-psa-grades-getting-lower/ ("PSA is grading a bit tougher (whether they'll admit it or not…."); *see also id.* ("By tightening the criteria for PSA 10s, PSA effectively creates scarcity, which can help maintain or even boost demand and prices for those slabs.").

[21] *See, e.g.*, M. Felumlee, *supra* note 19 ("This isn't exactly breaking news, but PSA made some under-the-radar changes to its grading standards recently….").

[22] *See id*.

in fact changed in practice long before 2025, yet he and PSA had knowingly misled its consumers – and even charged its customers a premium for its grading services – by denying that the changes had been made. And notably, in the course of a meeting that Lichtman had with Turner during the summer of 2025, Turner confirmed to Lichtman that PSA's grading standards *had* changed in recent years. Turner also confirmed to Lichtman that PSA had made its grading standards stricter and more exacting than they had been before Collectors acquired PSA in 2021.

38. Collectors Holdings' and PSA's false and deceptive statements regarding PSA's grading standards – and the changes that PSA actually made to PSA's grading standards – have caused substantial harm to Lichtman. Lichtman reasonably relied on the comments that Collectors Holdings, PSA and Turner had made regarding PSA's grading standards by, among other things, purchasing numerous high-end cards **that were not in PSA holders**. If Turner's public statements had been truthful, the cards in question would have been crossed to PSA holders on the same grades, thereby preserving or enhancing the significant investments that Lichtman had made in those cards. The cards in question had even been recommended to Lichtman by multiple independent experts, including former head graders at other grading companies, who confirmed to Lichtman that, *assuming PSA's grading standards had not been changed*, those cards should and would cross to PSA at the same grades. However, PSA's graders failed and refused to cross the cards that Lichtman had purchased in reasonable reliance on PSA's false assurances regarding the purported consistency of PSA's grading standards, causing the market value of Lichtman's cards to plunge in value. The reality was that, contrary to various representations and assurances that Collectors Holdings, PSA and Turner made to consumers, PSA's grading standards had changed in material ways, as they knew when they falsely represented to the public that PSA's grading standards were unchanged. And, to make matters worse, PSA has abused its market power by refusing to cross cards from other grading companies, most notably SGC (which PSA now owns), in order to encourage collectors to grade with PSA.

39. The undisclosed changes that Collectors made to PSA's grading standards had a real and sometimes significant impact on the commercial values of any number of high-end cards purchased by Lichtman and others. One consequence of these changes has been that – although

PSA has yet to admit this – PSA graders routinely assign lower grades to cards than those same cards would have received in the past – or refuse to honor or recognize grades that PSA or SGC had assigned to certain high-end cards in the past.

40. Nevertheless, PSA has failed and refused to take the steps that are needed to address the inconsistencies between the grades assigned to some cards under its old grading standards and the lower grades that PSA now assigns under the stricter standards that it has implemented in recent years. Nor has PSA been willing to take necessary or adequate steps to remedy the damaging effects that its surreptitious alterations of its grading standards have had on collectors such as Lichtman – such as compensating the owners of cards that PSA evaluated under the stricter standards that it adopted in recent years (which consequently received lower grades than cards of the same or comparable quality had received under the old grading regime); or even by publicly and unambiguously acknowledging all of the changes that PSA has made to its grading standards, as well as the inconsistencies, anomalies, and deleterious consequences that those changes have caused and will cause collectors to experience in the resale market.

**C. PSA's Breaches of Its Contractual Obligations to Lichtman**

41. When Lichtman agreed to submit and did submit various cards that he owned to PSA for evaluation and other services, PSA had several express and implied contractual obligations to him, including duties arising under the PSA Grading Standards, PSA Submission Services Terms and Conditions, PSA User Agreement, and PSA Authenticity and Grade Guarantee that were in effect on the dates that Lichtman submitted his cards to PSA for grading, crossing, or other services. Additionally, PSA was required to make decisions about whether to grade the cards that Lichtman submitted to PSA – and to assign grades to those cards – in accordance with PSA's Grading Standards, including by honestly applying the basic, objective standard that PSA claims to utilize in its grading decisions.

42. However, in its dealings with Lichtman and in the grading decisions that PSA made concerning Lichtman's cards, PSA materially breached the obligations that it owed to Lichtman in several ways. For example, PSA breached its contractual obligations by, among other conduct, failing and refusing on multiple occasions to cross and/or grade some or all of the cards that

Lichtman submitted to PSA, and, in some cases, at all. Indeed, even in instances in which PSA accepted tens of thousands of dollars in fees from Mr. Lichtman to evaluate and cross or grade his cards, PSA failed to honor its duties to Lichtman by, among other things, failing to make or confirm grading decisions related to Lichtman's cards in good faith or to assign his cards PSA grades that were objectively warranted and accurate under PSA's Grading Standards.[23]

43. PSA also acted unfairly and in bad faith toward Lichtman when Turner's personal financial interests prompted or contributed to PSA's refusal to cross, assign PSA grades to, and/or reholder[24] certain extremely valuable cards that Lichtman owned and had submitted to PSA for such services. A case in point was PSA's unreasonable refusal to "cross" a 1952 Bowman Mickey Mantle card owned by Lichtman that had previously received a perfect SGC-10 grade. Notably, before Lichtman submitted his 1952 Bowman Mickey Mantle card to PSA, **four independent grading experts had inspected that card and described it as exemplary and worthy of the highest grade it had received – namely, an SGC-10**. Yet, when Lichtman submitted his 1952 Bowman Mantle card to PSA in 2022, PSA refused to cross it and provide it with the PSA-10 grade that its pristine condition and quality dictated. This decision significantly reduced the commercial value of Lichtman's Mantle card.

44. PSA's refusal to cross Lichtman's 1952 Bowman Mickey Mantle card, to place it in a PSA holder, or to assign it the PSA-10 grade that it warranted were particularly appalling –

---

[23] Lichtman also is informed and believes, based in part on publicly available information, that on at least one occasion, PSA knowingly refused to decertify, correct, or qualify an erroneous and inflated grade that PSA had previously assigned to an altered (i.e., hand-cut) T206 Honus Wagner card because the card had been acquired by a shareholder of Collectors Holdings. Such preferential treatment for Collectors Holdings insiders and selective willingness to waive PSA grading standards has further undermined the fairness and reliability of the PSA grading system. *See, e.g.,* C. Olds, *Mastro pleads guilty to mail fraud, admits trimming famed Honus Wagner card*, BECKETT (Oct. 13, 2013), https://www.beckett.com/news/mastro-pleads-guilty-to-mail-fraud-admits-trimming-wagner-card/.

[24] PSA's so-called "Reholder" service "applies to trading cards that were already graded by PSA, but that the customer would like placed into the most current PSA holder." *See* https://www.psacard.com/services/tradingcardgrading/reholder. For this submission type, PSA states that the cards "will not be re-graded. The cards will be received and then inspected to determine if the card and PSA holder are authentic. [¶] Once it is determined that the holder and card are genuine, the card will be removed and placed into a new PSA holder." *See id.*

and indicative of PSA's bad faith and lack of objectivity – given the following facts:

a. PSA would have received a substantial fee from crossing Lichtman's card, so its refusal to do so ran contrary to its financial interests[25];

b. Before Lichtman submitted his 1952 Bowman Mickey Mantle card to PSA, four independent grading experts had inspected the card and concluded both that it was exemplary and that it was worthy of the highest grade that it had received, namely, a 10;

c. PSA was unable to provide a reasonable, cogent, or even plausible explanation for its decision, stating only – without explanation, substantiation or support – that it had purportedly seen a nonexistent "problem with the bottom edge," which none of the experts who had already reviewed the card had detected; and

d. The real reason for PSA's refusal to cross Lichtman's 1952 Bowman Mickey Mantle card was that, as Lichtman later learned, Turner owned one of only two known 1952 Bowman Mickey Mantle cards that had received grades of PSA-10 – and thus, *Turner had a personal financial stake in PSA's decision regarding Lichtman's card*. If PSA had crossed Lichtman's card in a fair and honest manner and had provided Lichtman's Mantle card with the grade of PSA-10 that it deserved, that action would have decreased the rarity and resale value of the 1952 Bowman Mantle card that Turner owned.

45. PSA unreasonably refused to cross other cards that Lichtman submitted to PSA as well. As noted, "crossover" services are the grading services that PSA claims to provide to customers who submit cards graded by one of PSA's past or current competitors for re-evaluation.[26] But in Lichtman's case, PSA inexplicably refused to cross virtually all of the cards

---

[25] By way of reference, Lichtman paid PSA the staggering fee of $73,834 for crossing the only card of his that PSA agreed to cross in 2024, namely, his 1961 Fleer #8 Wilt Chamberlain rookie card.

[26] PSA's website describes its crossover services as follows: "Crossover grading is for cards previously graded by other companies that you wish to cross over into a PSA holder. PSA will evaluate the card inside its current holder. If PSA deems the card worthy to cross over at the customer's specified minimum grade or higher, the card will be removed from its holder and placed into a PSA holder. Regardless of the result, the grading price will be charged." *See* "Crossover," https://www.psacard.com/services/tradingcardgrading/crossover.

that Lichtman submitted in 2022 and 2024. PSA refused to cross many cards graded highly by SGC, which was significant for multiple reasons. Most notably, Collectors Holdings acquired SGC in February 2024, further affirming the reliability of the grading decisions previously made by SGC's expert graders. Remarkably, PSA refused to reconsider its refusal to cross the majority of Lichtman's cards even after Lichtman appealed those decisions and pointed out the personal conflicts of interest that had infected some of them.[27]

46. A similarly harmful episode occurred in October 2024, when Lichtman submitted several cards to PSA for evaluation and crossing into PSA slabs. Remarkably, PSA initially refused to cross **any** of those cards – even though several of them had previously received high grades from reputable and esteemed experts in the industry. PSA even refused to assign the same grades to Lichtman's cards that they had previously received from the expert graders at SGC, which had been PSA's most significant competitor until Collectors Holdings acquired SGC in February 2024. There was no good faith basis for PSA's refusal to cross or grade Lichtman's valuable cards. Indeed, many of the same experts and professionals whom PSA now employs had previously affirmed that Lichtman's cards deserved the stellar grades that PSA refused to assign to them.

47. PSA also acted unreasonably and in bad faith, and was unjustly enriched at Lichtman's expense, when PSA charged Lichtman exorbitant and excessive fees that PSA failed to earn, but never refunded. PSA retained large fees paid by Lichtman even after PSA failed and refused to grade Lichtman's cards fairly, honestly, objectively or, in some cases, at all. This conduct contravened not only PSA's public commitments, but also its operative Terms and Grading Standards.

48. The Collectors Holdings insiders who stood to benefit personally from PSA's grading decisions with respect to Lichtman's cards included, but were not limited to, Turner himself.[28] Turner's personal collection of professional sports cards reportedly includes at least

---

[27] For its part, PSA disingenuously and implausibly denied that any conflicts of interest existed and refused to reconsider its refusals to cross Lichtman's cards.

[28] In addition to serving as the CEO of Collectors Holdings, Turner was and is a prominent sports

15,000 to 20,000 PSA-graded cards,[29] and has been estimated to be worth approximately $30 million or more.[30] Turner and certain other Collectors Holdings insiders had and have a personal financial stake in limiting the number of prominent cards receiving high PSA grades in order to maximize the values of the cards that previously received high PSA grades. Additionally, certain Collectors Holdings insiders, among them Turner, had personal financial interests in having PSA depress the grades that it assigned to a number of Lichtman's most valuable cards, or in PSA's refusal to grade or cross certain of Lichtman's cards, because those actions increased the absolute and relative commercial values of those insiders' competing cards. On top of that, Turner holds a personal grudge and animus toward Lichtman because of their earlier history, which included an incident in which Turner sought to buy one of Lichtman's valuable cards and another episode in which Lichtman objected to the manner in which Turner's personal financial interests were affecting PSA's decision-making regarding certain cards owned by Lichtman that were rivals to cards personally owned by Turner. In fact, on multiple occasions, Turner personally benefited from PSA's improper, unfair and bad faith decisions regarding cards that Lichtman owned and had submitted to PSA for grading or crossing, which, among other things, substantially lessened the commercial values of Lichtman's cards.

49. By letter from Lichtman's counsel to Collectors dated January 9, 2025, Lichtman demanded, pursuant to Section 17 of the User Agreement dated May 30, 2024, which was incorporated into the PSA Grading Terms and Conditions dated November 13, 2024, that PSA (1)

---

card collector who personally owns a vast collection of professional sports cards, including cards that compete with, and in some instances are of lesser quality than, Lichtman's cards. *See, e.g.*, G. Bates, *How passionate collector, industry CEO Nat Turner assembled one of hobby's largest, most valuable card collections*, Sports Collectors Digest (June 15, 2023), https://sportscollectorsdigest.com/news/nat-turner-collection-cards-michael-jordan-lebron-james-kobe-bryant-collectors.

[29] *See, e.g.*, Bates, supra note 30 ("Turner ... has registered over 13,000 slabs in his PSA registry. However, that's not all the PSA cards he owns. He figures his PSA-graded cards total between 15,000-20,000. [¶] He estimates he has another 5,000 slabbed Beckett Grading Services (BGS) cards and around 5,000 boxes of unopened packs. Yes, five thousand.").

[30] *See $30,000,000+ Card Collection! 🔥 Nat Turner Reveals His Unreal Collection*, SPORTS CARD INVESTOR (Oct. 13, 2024), https://www.youtube.com/watch?v=hSpHwjrw6U8.

agree to grade or cross the cards owned by Mr. Lichtman that PSA had refused to grade or cross; and (2) regrade certain of Lichtman's cards by applying an objective, good faith, and accurate standard, as the PSA Terms required. PSA refused these requests – though, notably, PSA "made some under-the-radar changes to its grading standards" **just days after receiving the letter from Lichtman's counsel**.[31]

50. PSA's breaches of its obligations to Lichtman, including, but not limited to, its duty of good faith and fair dealing, have directly and substantially damaged Lichtman in several ways. First, Lichtman was induced to pay, and did pay, exorbitant fees to PSA for grading services that PSA failed to perform properly or, in some cases, at all. PSA's failure to refund the substantial fees that Lichtman had paid – even after PSA failed to honor its obligations – caused Lichtman to suffer significant out-of-pocket damages in fees that he paid to PSA, while unjustly enriching PSA at Lichtman's expense. Second, PSA's failure to grade Lichtman's cards fairly, honestly, objectively, in good faith, and without bias, prejudice, or malice, caused Lichtman to suffer additional damages by, among other things, dramatically reducing the commercial value and reputation of a number of his most valuable cards. For example, PSA's bad faith refusal to cross a number of Lichtman's cards and place them in the PSA holders that their quality and condition warranted – including, but not limited to, his 1952 Bowman Mickey Mantle card – damaged Lichtman by substantially limiting the market for, and greatly reducing the resale values of, Lichtman's cards. Given the market dominance of PSA, Lichtman required a fair and objective grade from PSA for Lichtman to be in a position to realize and receive his cards' full economic values.

---

[31] *See, e.g.*, M. Felumlee, *supra* note 19; S. Ben-Ephraim, *supra* note 19 ("PSA is grading a bit tougher (whether they'll admit it or not….); *id.* ("By tightening the criteria for PSA 10s, PSA effectively creates scarcity, which can help maintain or even boost demand and prices for those slabs."); *see also* S. Ben-Ephraim, *What PSA's Centering Standards Mean for Collectors*, CARDLINES (Feb. 12, 2025), https://cardlines.com/psa-centering-standards-change/?srsltid=AfmBOoqdLcca0ah_wPnjtIp286UdbmuVBTFIdGIGh9Qp59eJOGqj9XIs, ("In January 2025, Professional Sports Authenticator (PSA) made a subtle update to its website that would significantly impact the sports card collecting industry.").

**E. Defendants' Unfair Business Practices and False Representations to Consumers**

51. Collectors Holdings and PSA also have engaged in unfair and dishonest business practices that go far beyond PSA's breaches of its contractual duties to Lichtman. In countless ways, Collectors Holdings and PSA have engaged in unfair and fraudulent business practices that have affected Lichtman and other consumers as well. These practices include, without limitation, the following:

a. PSA charges its customers fees each time a card is submitted for grading or regrading, even though PSA could use its own prior scans of that card to determine that it was previously graded. This practice gives PSA a financial incentive to under-grade cards when they are initially submitted, thereby causing its customers to be disappointed with the grades they received and prompting the customers to resubmit the cards and pay multiple submission fees rather than a single submission fee for PSA's grading services. Because PSA imposes a grading fee for each submission – even submissions of cards that were previously submitted and that PSA originally graded incorrectly – PSA increases its fees by assigning incorrect grades when cards are initially submitted. When customers such as Lichtman are then forced to resubmit their cards for *accurate* grading, PSA forces those customers to make duplicative payments to PSA for its grading services. PSA's practice of under-grading cards when they are initially submitted, thereby forcing the customers to make additional submissions until PSA finally assigns the grade that should have been assigned in the first instance, is unfair and fraudulent.

b. Second, contrary to its commitment to maintain and enforce fair, objective and consistent grading standards, PSA's grading process is and has been fraught with subjectivity and bias. For example, whereas PSA's business terms require PSA to "reholder" a card at a lower grade if such an adjustment is warranted under its current standards,[32] PSA in practice knowingly maintains artificially high grades, and refuses to lower inflated grades for cards that it knows to have received mistakenly high grades. PSA engages in this practice when it benefits financially from failing to enforce its grading standards honestly, fairly, and consistently. PSA has engaged

---

[32] "Holdering" is a process by which grading firms inspect, assign grades to, and encapsulate cards in plastic cases – referred to as "slabs."

in this conduct in some instances in order to avoid refunding fees to its customers and/or to avoid compensating customers such as Lichtman who were entitled to compensation for the harm they had suffered as a result of PSA's erroneous or inconsistent grading.

A case in point – and one that had a detrimental impact on Lichtman – is an instance in which PSA's conduct damaged the value of a pristine 1961 Fleer Wilt Chamberlain card in Lichtman's collection by failing to correct the grade of an inferior card acquired by another collector that had incorrectly been assigned a PSA-10 that it did not deserve – apparently to enable PSA to collect a reholdering fee *but avoid* honoring its guarantee to refund the difference between that card's value at the inflated grade that it had mistakenly been given and its lower value when the correct grade was assigned.[33]

c. Third, PSA also engaged in unfair business practices by skewing its grading practices to maximize its fees in other ways. For example, without disclosing to consumers that PSA frequently refuses to "cross" cards that were previously graded by its former rivals that PSA

---

[33] In August 2024, Lichtman paid one million seven hundred thousand dollars ($1,700,000.00) for a pristine 1961 Fleer Wilt Chamberlain card that was then in an SGC-10 holder. The president of SGC described Lichtman's Chamberlain card as the finest copy he had ever seen. Lichtman subsequently paid PSA seventy-three thousand dollars ($73,000.00) to have his Chamberlain card crossed to a PSA-10 holder, which it was (correctly). But after Lichtman bought his card, a rival card owned by another collector, which was *far inferior* to Lichtman's but had somehow received a PSA-10 grade that it did not deserve, was submitted to PSA for reholdering. Upon receiving this submission, **PSA should have lowered the PSA grade of that rival card, since it clearly did not deserve a PSA-10**. But PSA failed to comply with its obligations and representations and declined to regrade that rival card. On information and belief, PSA's decision not to correct the inflated PSA grade of that inferior card was made to enable PSA to collect its reholdering fee *and to also avoid* honoring its guarantee to refund the difference between the card's value at the erroneous grade and its lower value when the correct grade was assigned. After PSA failed to correct the inflated grade assigned to that inferior Chamberlain card, that card sold at auction for less than one million dollars ($1,000,000.00). That sale of the rival, inferior card with an inflated PSA-10 grade created a precedent for a sale of that particular card with a PSA-10 grade and, as a result, substantially lessened the resale value of Lichtman's Chamberlain card, which was and is truly deserving of its PSA-10 grade. After the buyer of the rival card received that card, it was sent to the PSA vault, where, upon inspection, PSA admitted that the PSA-10 grade that it had been assigned was incorrect. However, the damage had been done, since a precedent had been established for a 1961 Fleer Wilt Chamberlain card with a PSA-10 grade selling for less than $1,000,000, which has reduced the value of Lichtman's pristine card (which is deserving of the PSA-10 grade).

had since acquired such as SGC, PSA has fraudulently induced customers such as Lichtman to pay fees for crossover submissions of cards that PSA then refused to "cross," returning those cards in their original holders while pocketing the fees that Lichtman had been induced to pay PSA.

d. Fourth, Collectors Holdings and PSA have engaged in false and misleading advertising, as well as unfair and fraudulent behavior, by falsely representing to consumers and the public, including in advertising and marketing statements that it made and disseminated within the State of California to Lichtman as well as others, that PSA's grading standards were and are fair and objective; that its grading standards had not changed and would not change over time; and that PSA's graders would fairly and objectively evaluate and grade all cards submitted by collectors such as Lichtman. Turner himself stated publicly, including on podcasts, that PSA's grading standards had not changed. These representations were false and misleading when they were made. In reality, PSA's grading standards *have* changed in recent years, as Collectors Holdings and PSA well knew when the statements were made. Moreover, PSA's grading standards have not been and are not applied consistently, fairly or objectively. By applying inconsistent and changing standards that are rife with subjectivity, and by allowing subjective and undisclosed factors such as the personal financial interests of certain Collectors Holdings insiders to influence some of its grading decisions, PSA has sowed confusion among consumers and the public, and caused Lichtman and other collectors to incur significant damages, including lost fees and other economic losses.

e. Fifth, PSA has further violated its commitments to implement and enforce fair and objective grading standards by refusing to adjust the original, higher grades that PSA had assigned to certain cards under its old grading standards, before PSA implemented a more restrictive and stringent grading regime. By knowingly applying stricter standards to more recent submissions and refusing to take appropriate steps to rectify or account for the discrepancies that its fluctuating grading standards have caused, PSA has injured Lichtman and other consumers by virtue of its having knowingly and fraudulently maintained, implemented, and enforced inconsistent quality and grading standards that varied based on when a card was graded, while deceiving and misleading customers and the public into believing that its grading standards were

and had been constant, consistent and unfluctuating.

f. Sixth, Collectors Holdings and PSA also have engaged in unfair and fraudulent business practices by allowing the personal financial interests of Collectors Holdings' insiders to influence and undermine the objectivity of PSA's grading and/or crossing decisions with respect to cards submitted by PSA's customers, including very valuable cards that Lichtman owns. Moreover, PSA has further skewed its grading standards by grading – and upgrading – cards owned by Collectors Holdings executives, investors and/or shareholders, including, but not limited to, Turner. In the absence of controls, rules and/or procedures sufficient to preserve the independence and integrity of PSA's grading decisions, and to prevent the fairness and objectivity of those grading decisions from being compromised by the personal interests of senior executives of PSA's parent company or other influential insiders in the Collectors Holdings corporate hierarchy, PSA's graders repeatedly acted on Lichtman's submissions in ways that were unfair and inimical to Lichtman's interests – whether by assigning preferential grades to cards owned by a Collectors Holdings insider, or by refusing to assign fair and objective grades to cards owned by Lichtman or to rival cards owned by other collectors, including in cases in which Collectors Holdings insiders had actual or potential economic interests in those grading decisions. In certain instances, for example, PSA assigned lower grades to cards submitted by Lichtman than the preferential grades that Turner's rival cards received, despite the fact that Lichtman's cards were of the same or superior quality to that of the cards owned by Turner. In other instances, PSA's graders unfairly refused to assign fair grades to Lichtman's cards despite the fact that those cards had previously been assigned very high grades by reputable and expert evaluators. These grading decisions inflicted substantial financial harm on Lichtman, while increasing the perceived rarity and commercial value of rival cards owned by Turner. And, to make matters worse, PSA has authenticated and graded cards personally owned by Turner or other Collectors Holdings insiders, and has assigned preferential grades to those cards. Moreover, in at least one instance, PSA failed to decertify, correct, or qualify an erroneous and inflated grade that PSA had previously assigned to card owned by a Collectors Holdings insider. In these and other ways, Collectors Holdings and PSA – by failing to implement rules and procedures adequate to prevent conflicts of interest from

undermining the fairness and objectivity of PSA's grading decisions – have compromised the independence and integrity of PSA's grading system, and in some instances, have allowed and enabled the personal financial interests of Collectors Holdings insiders to compromise the fairness, objectivity, reliability and accuracy of PSA's grading decisions. This conduct is fraudulent, dishonest and unfair because, among other reasons, it contradicts PSA's public commitments to a fair and objective grading process.

g. Seventh, Collectors Holdings further deceived and misled consumers, collectors and the public through false assurances and commitments that it made with respect to its enormously impactful acquisition of SGC.[34] When Collectors Holdings acquired SGC in February 2024, Collectors Holdings provided a number of public assurances regarding its plans for SGC that were intended to, and did, induce consumers and collectors such as Lichtman to act in reliance on such assurances to their detriment. For example, Collectors Holdings assured consumers that SGC would operate independently within the Collectors Holdings portfolio and would continue to be led by its pre-acquisition management team. Collectors Holdings further assured consumers and collectors such as Lichtman that, after the SGC acquisition, Collectors Holdings would allow PSA and SGC to continue to operate as separate and distinct brands. Another public statement assured customers that "SGC will remain an independent grading brand and no changes are contemplated," and even "promis[ed] an exciting future of enhanced services and offerings for our loyal customers." But following Collectors Holdings' acquisition of SGC, Collectors Holdings quickly betrayed its commitments to allow SGC to operate independently by undermining its operational independence and significantly downgrading its operations. Indeed, in the summer of 2025, Collectors Holdings announced that SGC would thereafter be run as a "boutique" grading brand whose operations would be "scale[d] down" from those of a "major authenticator" to the far

---

[34] As one industry commentator observed at the time: "The world of sports card grading was hit by a bomb on Wednesday night. Collectors, which is the company that owns PSA, the biggest company in the grading, is acquiring SGC Grading, the second-largest outfit in the game. PSA's Takeover Of SGC, changes the landscape of grading completely." S. Ben-Ephraim, *What Is The Future Of PSA And SGC After Merger Bomb*, CARDLINES (Feb. 29, 2024), https://cardlines.com/psa-sgc-merger/?srsltid=AfmBOorehaCy-XEAKNCbLSXdqMrirbS4pBIkVmfKeDvFd_UXGYBBerqs.

more limited and marginal activities of a so-called "boutique" grading brand.[35] This announcement prompted the immediate resignation of SGC's president and led SGC's grading volume to fall precipitously; in fact, according to independent industry sources, SGC's grading volume plummeted roughly 70% year over year.[36] Further, the pricing model that SGC had used to compete was substantially revamped (especially in the category of trading card games ("TCG"), a grading category in which SGC had experienced tremendous growth). It thus became evident that Collectors Holdings and Turner had not been forthright in the statements that they had made around the time the SGC acquisition had been announced. In fact, the empirical evidence suggests that Collectors Holdings' overriding plan in acquiring SGC was to neutralize PSA's biggest competitor – and especially to prevent SGC from reducing its prices and thereby putting pressure on PSA's profit margins in its grading business. These and other actions by Collectors Holdings relative to SGC have had very real and grave consequences for Lichtman and many other collectors who utilized the expert grading services that SGC offered for many years and who made decisions about their collections in reliance on the expertise, prestige and value formerly associated with the SGC brand and on the assurances regarding SGC that Collectors provided to consumers when it acquired SGC. Those consequences have included, in Lichtman's case, a serious diminution of the values of multiple cards he owns that were graded by SGC prior to its acquisition, but that Lichtman refrained from selling in reliance on Collectors Holdings' false and deceptive public assurances regarding its plans and intentions with respect to SGC.[37]

---

[35] *See, e.g.*, B. Burrows, *SGC to transition to 'boutique' grading brand as president resigns*, YAHOO! SPORTS (JUL 24, 2025), https://sports.yahoo.com/article/sgc-transition-boutique-grading-brand-154500650.html.

[36] *See, e.g.,* H. Ruiz, *Gem Rate report reveals SGC grading falls off a cliff*, SPORTS ILLUSTRATED (Oct. 4, 2025), https://www.si.com/collectibles/gem-rate-report-reveals-sgc-grading-falls-off-a-cliff#:~:text=SGC%20graded%20fewer%20cards%20than,brand%20dying%20before%20our%20eyes?&text=The%20latest%20Gem%20Rate%20monthly,planning%20to%20scale%20SGC%20down.

[37] Notably, when Collectors Holdings announced its Beckett acquisition in December 2025, Collectors Holdings made promises much like the ones it had made and broken with respect to SGC – including vowing to preserve Beckett's structural and operational independence after the acquisition and to allow Beckett to retain its own brand, grading staff, standards, customer service, marketplace, and price guides. *See, e.g.*, B. Burrows, *PSA parent company Collectors acquires Beckett*, CLLCT (Dec. 15, 2025), https://www.cllct.com/sports-collectibles/memorabilia/psa-parent-

52. All of the foregoing unfair and fraudulent business practices have caused very significant harm to Lichtman and other consumers in countless ways. Moreover, by virtue of Collectors Holdings' and PSA's dominant position in the sports card grading and authenticating market, their unfair and fraudulent business practices and false representations have compromised and undermined the integrity of the market as a whole. Unless enjoined from continuing to operate in this fashion, Collectors Holdings and PSA will continue to engage in unfair and dishonest business practices, which threaten to cause Lichtman and other collectors and consumers to suffer substantial additional harm in the future.

**FIRST CLAIM FOR RELIEF**

**(For Breach of Contract Against PSA)**

53. Lichtman incorporates the allegations in Paragraphs 1 through 40 of this Complaint, inclusive, as if set forth in full herein.

54. PSA materially breached its contractual obligations to Lichtman under its applicable PSA Grading Standards, PSA Submission Services Terms and Conditions, PSA User Agreement, and PSA Authenticity and Grade Guarantee by engaging in the following acts, among others:

a. Failing to provide Lichtman with objectively accurate PSA grades for the cards that Lichtman submitted, including by failing to apply a basic, objective standard when

---

company-collectors-acquires-beckett ("Beckett will remain an independent brand and continue to utilize its own operations, customer service, grading standards, marketplace, magazines and price guides, Collectors said."). It remains to be seen whether and to what extent Collectors Holdings will honor these commitments over the long term; in the first months after the Beckett acquisition was announced, Collectors Holdings and PSA reportedly began integrating PSA's database, infrastructure, and technology into Beckett's operations – and even announced certain "cross-brand collaborations" involving PSA, SGC and Beckett. *See* J. Perez, *What's next for three of the biggest grading card companies?*, COMICS BEAT (Jan. 20, 2026), https://www.comicsbeat.com/whats-next-for-the-three-of-the-biggest-grading-card-companies/. *See also* S. Ben-Ephraim, *PSA Buys Beckett Grading Services (BGS), Will Remain Independent For Now*, CARDLINES (Dec. 17, 2025), https://cardlines.com/psa-buys-beckett-grading-services-bgs-will-remain-independent-for-now/ ("Collectors have stated that it 'will look to enhance Beckett's offering while preserving the ability for hobbyists to choose what is best for every unique item in their collection. [¶] … But as we know from the similar case of SGC, … that is unlikely to be the case. [¶] As of now, the companies will not share staff or operational centers. This again may eventually change…. [¶] [A] year into the [SGC] deal, there's a growing mountain of evidence that SGC isn't just being left alone — it's being scaled back, perhaps intentionally, to protect PSA's dominance.").

evaluating Lichtman's cards; and failing to minimize any subjective element in its grading decisions in accordance with the express limitations set forth in PSA's Grading Standards;

b. Failing to make grading and crossing decisions with respect to Lichtman's cards fairly, objectively and in good faith, including, but not limited to, by unfairly refusing to assign appropriate and warranted PSA grades to Lichtman's cards based solely on their merits and in accordance with PSA's grading standards; and by enabling and allowing the personal financial interests and/or personal animosity of one or more executives, shareholders and/or investors of Collectors Holdings to influence and taint certain of those grading and/or crossing decisions;

c. Failing to refund the substantial fees that PSA charged Lichtman and accepted from him despite PSA's failures to honor its obligations to Lichtman and/or to perform the grading services for which Lichtman paid properly, adequately, in good faith, or in some cases at all; and

55. As a direct and proximate result of PSA's material breaches of its contractual obligations to Lichtman, Lichtman has suffered substantial damage in an amount to be proven at trial.

56. Notwithstanding Lichtman's demand that PSA honor its duties to Lichtman and perform the grading and crossing services that it was required to perform, PSA has refused to do so, and has failed to compensate Lichtman for the damages that he has suffered and will suffer in the future as a result of PSA's material breaches of its contractual obligations.

57. Lichtman has performed all of the duties, conditions, covenants and promises that he was required to perform, except to the extent, if at all, that his performance was excused by PSA's failure and refusal to honor its obligations to Lichtman.

## SECOND CLAIM FOR RELIEF

**(For Breach of the Implied Covenant of Good Faith and Fair Dealing Against PSA)**

58. Lichtman incorporates the allegations in Paragraphs 1 through 57 of this Complaint, inclusive, as if set forth in full herein.

59. The PSA Grading Standards, PSA Submission Services Terms and Conditions, PSA User Agreement, and PSA Authenticity and Grade Guarantee contain an implied covenant of

good faith and fair dealing pursuant to which PSA was obliged to refrain from unfairly frustrating or interfering with Lichtman's right to receive the benefit of his bargain with PSA. The implied covenant also obliged PSA to exercise any contractual discretion in good faith. *See Carma Developers (Cal.), Inc. v. Marathon Dev. Cal.*, *Inc.*, 2 Cal. 4th 342, 372 (1992) (finding that the implied covenant of good faith and fair dealing "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another" and "[s]uch power must be exercised in good faith").

60. PSA is vested with discretionary power to assign grades, process crossover requests, and administer PSA's Authenticity and Grade Guarantee. PSA's own Submission Services Terms and Conditions acknowledge that grading services involve individual judgments that are subjective and require the exercise of professional opinions. By virtue of that discretionary power, PSA owed Lichtman a duty to exercise its discretion in good faith and consistent with Lichtman's reasonable expectations.

61. PSA breached the implied covenant by exercising its grading, crossover, and guarantee discretion arbitrarily, inconsistently, and in bad faith so as to unfairly frustrate Lichtman's reasonable contractual expectations and preclude him from receiving the contractual benefits for which he bargained. PSA's bad faith conduct undermined the spirit of the bargain and unfairly interfered with Lichtman's rights to receive the benefits that he reasonably expected under his agreements with PSA, including, without limitation, by:

a. Systematically under-grading Lichtman's cards;

b. Skewing, delaying, or denying crossover determinations on Lichtman's cards while retaining fees, contrary to the implied promise of fair, good-faith crossover evaluation under PSA's stated standards;

c. Applying stricter internal standards to later submissions while maintaining earlier inflated grades, creating undisclosed inconsistencies across time that deprived Lichtman of fair, even-handed grading and consistent valuations; and

d. Administering PSA's Authenticity and Grade Guarantee pretextually, including by allowing insider financial interests (including those of Collectors Holdings

executives, investors, or shareholders) to influence grading and/or crossing outcomes, tainting the good-faith exercise of contractual judgment.

62. As a direct and proximate result of PSA's breaches of the implied covenant of good faith and fair dealing, Lichtman has suffered damages in an amount to be proven at trial.

63. Lichtman has performed all of the duties, conditions, covenants, and promises that he was required to perform, except to the extent, if at all, that his performance was excused by PSA's failure and refusal to honor its express and implied obligations to Lichtman.

## THIRD CLAIM FOR RELIEF

**(For Fraudulent Misrepresentation Against PSA, Collectors Holdings, and Does 1 Through 25)**

64. Lichtman incorporates the allegations in Paragraphs 1 through 57 of this Complaint, inclusive, as if set forth in full herein.

65. On various dates as specified above, PSA assured and represented to Lichtman and other consumers that PSA operated as a neutral and objective grading and authentication service that fairly and honestly graded collectible sports cards submitted by its customers based upon and in accordance with basic, objective and transparent grading standards that minimized subjectivity on the part of its graders and that had not changed and would not change over time.

66. Further, on various dates prior to and around the dates that Lichtman submitted cards that he owned to PSA for grading and/or crossing services, including, without limitation, in and around October 2024, PSA represented to Lichtman that PSA would evaluate his cards fairly, honestly and objectively, and would provide his cards with the objectively accurate and fair PSA grades that their conditions warranted, pursuant to and in accordance with PSA's Grading Standards that were then in effect.

67. Additionally, in and after February 2024, as detailed in Paragraph 51(g) above, Collectors Holdings and its representatives, among them Turner, made various statements, and provided Lichtman and other high-end collectors and consumers with various specific assurances, relating to Collectors Holdings' acquisition of SGC, its plans for SGC following that acquisition, and the particular manner in which SGC would be operated following that acquisition.

68. All of the foregoing representations were false and fraudulent when they were made, and Collectors Holdings knew they were false.

69. For example, when Collectors Holdings and PSA falsely stated and assured consumers and collectors that PSA's grading standards had not changed and would not change over time, Collectors Holdings and PSA knew that those representations were false, and further knew and intended that those representations and assurances would not be honored in the future. In particular, Collectors Holdings and PSA knew, among other things, that PSA's grading standards *had changed* and would continue to change, as evidenced, in part, by the following facts:

a. In early 2025, PSA officially modified its official grading criteria in important respects[38]; and

b. At or around the time that PSA formally adopted changes to its grading standards in early 2025, Turner, the CEO of Collectors Holdings, stated that the changes that PSA had made to its grading criteria actually represented "[n]o change in day-to-day" at all because "that's how we've been operating for a very long time." Turner further admitted that PSA had "[j]ust updated the language on the website" because "[t]hat is how we have been operating for a very long time, so it needed updating." Thus, Turner, on behalf of Collectors Holdings and PSA, admitted that they had been misleading their customers, such as Lichtman, when they had assured and represented to them on countless occasions prior to 2025 that PSA's grading standards had not changed and would not change in the future. As Turner himself admitted, PSA had surreptitiously changed its grading standards in practice well before 2025, yet PSA had denied that the changes had been made. Those admissions demonstrate that, when Collectors Holdings and PSA had made the foregoing false and fraudulent assurances, and representations concerning its purportedly unchanged, constant, and never-changing standards, Collectors Holdings and PSA had known them to be false and misleading.

[38] *See, e.g.*, "PSA Changes Grading Standards," https://cardhoundvintage.com/psa-changes-grading-standards/ (May 3, 2025) ("This isn't exactly breaking news, but PSA made some under-the-radar changes to its grading standards recently….").

c. During a meeting with Lichtman during the summer of 2025, Turner confirmed to Lichtman that – contrary to some of Collectors Holdings' and PSA's earlier public representations – PSA's grading standards had changed. He further admitted that PSA's grading standards were stricter than they had been before Collectors Holdings had acquired PSA.

70. The foregoing false and fraudulent assurances and representations by Collectors Holdings and PSA were made with the intention, and for the very deliberate purpose of inducing Lichtman and other consumers to act in reliance on them. For example, Collectors Holdings and PSA made and provided the foregoing assurances and representations with the intent and for the purpose of inducing Lichtman and other consumers to pay PSA exorbitant fees in reliance on PSA's commitment to maintain consistent and objective grading standards over time.

71. Lichtman did in fact reasonably and justifiably rely on the foregoing assurances and representations to his detriment. Among other things, Lichtman detrimentally relied on Collectors Holdings' and PSA's assurances regarding its grading standards by making numerous submissions of valuable cards that he owned to PSA and paying exorbitant fees to PSA, which were never refunded. Lichtman's reliance on these assurances and representations was reasonable and justified because, among other reasons, Collectors Holdings, PSA and their representatives repeated them many times; and they were echoed, confirmed and formalized by the grading standards that PSA had officially adopted and posted on its website.

72. Additionally, Lichtman reasonably, justifiably and detrimentally relied on various assurances that Collectors Holdings and its representatives made with respect to the independence, integrity and operation of SGC following its acquisition in February 2024 by, among other things, refraining from selling various cards that Lichtman owned that SGC's graders had evaluated and assigned very high SGC grades in the years prior to SGC's acquisition by Collectors Holdings. Lichtman's reliance on these promises and representations was reasonable and justified because, among other reasons, (a) senior executives of both Collectors Holdings and SGC repeatedly and publicly provided these very specific and definitive assurances; (b) Collectors Holdings concealed its true plans to degrade, diminish, and decimate SGC's operations for a period of time after the acquisition; and (c) Collectors Holdings delayed for a period of time before forcing out SGC's

president and taking other steps that made it apparent that SGC's operational independence, business integrity, and grading services had been downgraded and were being decimated.

73. When the foregoing false and fraudulent assurances and representations were made, and when Lichtman took the actions he took in reliance on those statements as alleged herein, Lichtman was ignorant of PSA's and/or Collectors Holdings' actual, secret intentions – including, specifically, their plan to change PSA's grading standards and to betray PSA's commitment to provide Lichtman with objectively accurate and fair grades for the cards that he submitted to PSA for grading or crossing; and/or Collectors' Holdings' intention to neuter and decimate SGC and destroy the value, reputation and prestige of the SGC grades that Lichtman's cards had received prior to the SGC acquisition. Moreover, Lichtman could not, in the exercise of reasonable diligence, have discovered those intentions. If Lichtman had known of the actual intentions of PSA and Collectors Holdings, Lichtman would have refrained from submitting any of his cards to PSA for grading or crossing, or from paying exorbitant fees to PSA for those services; and he would have sold the valuable cards in his collection that had received SGC grades immediately after Collectors Holdings acquired SGC.

74. As a direct and proximate result of the fraudulent conduct of Collectors Holdings and PSA as alleged herein, Lichtman has suffered and will suffer damages in an amount as yet unascertained, but is believed to exceed five million dollars ($5,000,000). Lichtman's damages include, but are not limited to, the cumulative amount of the fees that he paid to PSA and that were never refunded or returned; the substantial reduction in the amounts that Lichtman can and will receive when selling a number of the valuable cards in Lichtman's collection that PSA failed to grade or cross objectively or based on objective grading standards that did not change over time; and the substantial reduction in the resale values of the cards in Lichtman's collection that received SGC grades prior to its acquisition by Collectors Holdings and the ensuing downgrading and effective devaluation of SGC-rated cards, as alleged above.

75. The foregoing conduct on the part of PSA, Collectors Holdings, and Does 1 through 25 constituted intentional fraud, misrepresentation and deceit with the intention on the part of those Defendants to deprive Lichtman of property or legal rights or otherwise cause injury,

and was despicable conduct that subjected Lichtman to cruel and unjust hardship in conscious disregard of his rights, so as to justify an award of punitive and exemplary damages.

**FOURTH CLAIM FOR RELIEF**

**(For Promissory Fraud Against PSA, Collectors Holdings, and Does 1 Through 25)**

76. Lichtman incorporates the allegations in Paragraphs 1 through 57 of this Complaint, inclusive, as if set forth in full herein.

77. On various dates and in various communications as specified above (including in connection with Lichtman's submission of his cards for grading and/or crossover services to PSA), Collectors Holdings, PSA and their officers, directors, managers, employees, agents, and representatives (including Turner), rendered the following promises and representations to Lichtman at meetings, through public statements, and through website postings:

a. PSA (i) was and would remain a neutral, objective grading and authentication service; (ii) would fairly and honestly grade cards submitted by customers in accordance with objective grading standards that had not changed and would not change over time; and (iii) would continue to apply those standards consistently over time and across submissions;

b. PSA would evaluate Lichtman's cards fairly, honestly, and objectively, and would provide his cards with the accurate and fair PSA grades that their conditions warranted in accordance with PSA's then-effective Grading Standards;

c. PSA would evaluate crossover requests in good faith and in accordance with PSA's published standards and policies; and would not deny, delay, or skew crossover outcomes based on undisclosed or improper considerations; and

d. PSA would administer its Authenticity and Grade Guarantee fairly, in good faith, and free from conflicts, favoritism, or insider influence.

78. Also, in connection with Collectors Holdings' February 2024 acquisition of SGC, Collectors Holdings and its representatives, among them Turner, promised that Collectors Holdings would preserve SGC's operational autonomy, independence, integrity and brand; would not degrade or diminish SGC's operations; and would maintain the value, reputation, and prestige

of SGC grades, thereby protecting the value of SGC-graded cards owned by collectors such as Lichtman.

79. PSA and Collectors Holdings made the foregoing material promises with the intent and for the purpose of inducing Lichtman and others to rely on those promises by (among other things) submitting cards for grading and crossing to PSA, paying PSA substantial fees, maintaining their holdings in SGC-graded cards, and otherwise transacting with Collectors on the belief that PSA's grading standards would remain constant and objectively applied.

80. When PSA and Collectors Holdings made the foregoing promises, they did so knowing they were false and with the contemporaneous intention not to perform or honor them, as evidenced by, among other actions: (a) PSA's informal, undisclosed implementation of changes to its grading criteria before announcing formal changes in 2025; (b) PSA's near-immediate degradation of SGC's operations following Collectors Holdings' acquisition of SGC, thereby undermining the value and prestige of SGC grades; and (c) PSA's efforts to advance the financial interests of Collectors Holdings insiders. These efforts to bolster its insiders' interests included the application of undisclosed internal standards to later submissions to artificially maintain earlier inflated grades, the selective denial of crossover outcomes notwithstanding promises of the fair application of public standards, and the pretextual administration of the PSA Authenticity and Grade Guarantee while allowing insider interests to taint grading and crossing outcomes.

81. Lichtman reasonably and justifiably relied on PSA's and Collectors Holdings' false promises, as alleged above. In reliance on those promises, Lichtman submitted numerous valuable cards to PSA for grading and crossover, paid substantial fees to PSA premised on PSA's commitment to maintain and fairly apply objective standards over time, refrained from selling various valuable cards that had received high SGC grades based on Collectors Holdings' false assurances regarding SGC's continued independence and integrity, and continued to transact with PSA in the belief that PSA graders would apply neutral grading standards and would fairly evaluate and cross his cards free from undisclosed biases and conflicts.

82. Lichtman was unaware, and could not have discovered through the exercise of reasonable diligence, that PSA's and Collectors Holdings' promises were false when made, as the

plan to tighten PSA grading in practice, to deny and/or skew crossovers, to administer guarantees pretextually, and to degrade SGC were concealed from Lichtman and contradicted PSA's and Collectors Holdings' public statements and published standards.

83. As a direct and proximate result of the false promises and fraudulent conduct alleged herein, Lichtman has suffered and will suffer damages in an amount as yet unascertained, but believed to substantially exceed five million dollars ($5,000,000.00). Lichtman's damages include, but are not limited to, the cumulative fees that he paid to PSA for grading, crossover, and related services that were induced by PSA's false promises and never refunded; the reduction in the amounts that Lichtman can and will receive when he sells cards that PSA failed to grade or cross objectively and in accordance with consistent standards; and the substantial diminution in the resale values of cards in Lichtman's collection that received SGC grades prior to the SGC acquisition and were devalued by Collectors Holdings' degradation of SGC's brand and operations in conscious disregard and blatant violation of its promises to maintain SGC.

84. The foregoing conduct on the part of PSA, Collectors Holdings, and Does 1 through 25 constituted promissory fraud with the intention on the part of those Defendants to deprive Lichtman of property or legal rights or otherwise cause injury, and was despicable conduct that subjected Lichtman to cruel and unjust hardship in conscious disregard of his rights, so as to justify an award of punitive and exemplary damages.

## <u>FIFTH CLAIM FOR RELIEF</u>

**(For Unfair Competition Against PSA, Collectors Holdings, and Does 26 Through 50)**

**(Cal. Bus. & Prof. Code § 17200 *et seq.*)**

85. Lichtman incorporates the allegations in Paragraphs 1 through 57 of this Complaint, inclusive, as if set forth in full herein.

86. California's Unfair Competition Law ("UCL"), codified at California Business & Professions Code Section 17200 *et seq.*, prohibits, and provides civil remedies for, any acts of unfair competition, which it defines to include any unlawful, unfair or fraudulent business acts or practices and any unfair, deceptive, untrue or misleading advertising. The UCL's purpose is to protect consumers and competitors by promoting fair competition in commercial markets for

goods and services.

87. PSA and Collectors Holdings have violated the UCL in numerous ways, including, but not limited to, by engaging in the unfair and fraudulent business practices alleged in Paragraph 51 of this Complaint (including subparagraphs (a) through (g) thereof). Without limiting the foregoing, the false and misleading representations that Collectors Holdings and PSA made in advertisements and marketing statements that they made and disseminated to the public in the State of California, as alleged in Paragraph 51(d) above, constituted false advertising that deceived and is likely to deceive the consuming public, including Lichtman, in violation of Business and Professions Code Section 17500.

88. PSA and Collectors Holdings have profited from their unfair and fraudulent business practices at the expense of consumers such as Lichtman, and they will continue to reap illicit profits in the future if their unfair and fraudulent practices are not enjoined by this Court.

89. PSA's and Collectors Holdings' unfair and deceitful business practices also have harmed Lichtman and other consumers in numerous ways. In fact, Lichtman has suffered injuries in fact and has lost money and property value as a result of PSA's and Collectors Holdings' acts of unfair competition. Specifically, PSA's and Collectors Holdings' unfair and dishonest business practices have directly and proximately caused Lichtman to incur exorbitant fees that he paid to PSA in reliance on PSA's false commitments and representations; and they have artificially depressed the market value of a significant portion of Lichtman's card collection by millions of dollars, in an amount to be proven at trial.

90. Pursuant to Business and Professions Code sections 17203 and 17535, Lichtman seeks an order requiring PSA and Collectors Holdings to disclose their respective false and misleading statements, representations, and advertisements; and enjoining each of them and Does 26-50 from continuing to engage in the practice of advertising that PSA experts fairly and objectively apply PSA grading standards that have not changed, and do not and will not change over time or based on the consumer. Lichtman also requests an order awarding Lichtman restitution of the monies that he was wrongfully induced to pay to PSA as a result of its failure to disclose its unfair and fraudulent business practices and false advertising, in an amount to be

determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Lichtman prays as follows:

1. For compensatory damages in an amount to be proven at trial;
2. For punitive and exemplary damages;
3. For the equitable relief specified in Paragraph 85 of this Complaint and an injunction barring PSA, Collectors Holdings, and Does 26-50 from continuing to engage in unfair and/or fraudulent business practices, including an order mandating fair and evenhanded grading practices insulated from conflicts of interest involving Collectors Holdings insiders, fair crossover grading policies, and corrective disclosures concerning PSA's grading standards;
4. For pre-judgment and post-judgment interest at the highest available legal rate(s) from and after the date of service of this Complaint;
5. For costs and reasonable attorneys' fees; and
6. For such other relief as the Court may deem just and proper.

Dated: July 21, 2026

LOEB & LOEB LLP
David Grossman

By: ______________________________
DAVID GROSSMAN
Attorneys for Plaintiff
STEVE LICHTMAN

**DEMAND FOR JURY TRIAL**

Lichtman requests a jury trial on all matters so triable.

Dated: July 21, 2026

LOEB & LOEB LLP
David Grossman

By: ______________________
DAVID GROSSMAN
Attorneys for Plaintiff
STEVE LICHTMAN